[No. 37651. Department Two. November 24, 1965.]

THE CITY OF SEATTLE, *Respondent*, v. NORMAN E. SEE, *Appellant*.*

*Reported in 408 P.2d 262.

*Abbott & Curtis* and *Andrew Curtis, Jr.,* for appellant.

*A. L. Newbould, Jerry F. King,* and *Jorgen G. Bader,* for respondent.

*Paul D. Jackson,* amicus curiae.

BARNETT, J.†—This case involves the fire code of the city of Seattle and is before the court upon stipulated facts. The defendant is the owner of a warehouse located in Seattle. The warehouse is maintained as locked premises and is inaccessible to anyone except the defendant.

On or about February 14, 1963, the Seattle Fire Department, through its authorized representative, demanded of the defendant that an inspection be allowed as to the locked

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

premises. The fire department did not procure a search warrant nor present such to the defendant, and no claim was made that the fire department *had any reasonable cause to believe a violation of the ordinance existed at the time of the demand.* The defendant refused to allow the fire department to make the inspection.

Action was brought by the city against defendant by reason of the latter's refusal to submit to the fire inspection. A jury was waived and the case was tried on the stipulated facts in the Superior Court of King County. Defendant was found guilty and fined by the court $100 suspended.

Pertinent sections of the Fire Code, Seattle Ordinance 87870, follow:

Section 8.01.010:

Intent. This Title, referred to as the Fire Code, prescribes minimum standards for the safeguarding of life and property from the hazards of fire and explosion arising from the storage, handling and use of hazardous substances, materials and devices, and from conditions hazardous to life or property in the use or occupancy of buildings or premises. Hazards which are governed by specific reference shall also be subject to all other applicable provisions of this Title.

Section 8.01.050:

Inspection of building and premises. It shall be the duty of the Fire Chief to inspect and he may enter all buildings and premises, *except the interiors of dwellings,* as often as may be necessary for the purpose of ascertaining and causing to be corrected any conditions liable to cause fire, or any violations of the provisions of this Title, and of any other ordinance concerning fire hazards. (Italics ours.)

Section 8.01.120:

Definitions. . . . "Dwelling" means a building occupied exclusively for residence purposes and having not more than two (2) dwelling units or as a boarding or rooming house serving not more than fifteen (15) persons with meals or sleeping accommodations or both.

Section 8.01.140:

Penalty. Anyone violating or failing to comply with any provision of this Title or Lawful order of the Fire

Chief pursuant hereto shall upon conviction thereof be punishable by a fine not to exceed Three Hundred Dollars ($300.00) or imprisonment in the City Jail for a period not to exceed ninety (90) days, or by both such fine and imprisonment, and each day of violation shall constitute a separate offense.

We are dealing here with a warehouse and business premises. It will be noted that § 8.01.050 specifically excepts the interiors of dwellings and consequently the same may not be inspected against the owner's will without a warrant. It should also be noted that we are not concerned here with the seizure of evidence for use in court and there is no threat of a criminal penalty even if a fire hazard were detected. Under the sections of the ordinance noted above, the fire chief is made responsible for enforcing the code.

It is first contended that § 8.01.050 is not sufficiently clear in statement and meaning to, in fact, give authority to the fire chief to enter all buildings and premises without any showing of reasonable or probable cause. We disagree.

The above is clear and unambiguous. It gives authority to the fire chief or his representative to enter commercial premises for purposes of inspection without any showing of reasonable or probable cause. No provision is made for securing a search warrant. A suspicion of violation of the ordinance is not a precondition to the inspection under the ordinance. Nor can it be suggested that the city exceeded its authority by the adoption of this ordinance. The enactment of reasonable ordinances regulating the inspection of buildings for fire hazards and procedures for forced elimination of fire hazards is within the police power of a municipality. *Everett v. Unsworth,* 54 Wn.2d 760, 344 P.2d 728 (1959).

Since a search warrant is not required, we are immediately confronted with the question whether the ordinance is in violation of U. S. Const. amend. 4 and Const. art. 1, § 7.

The Fourth Amendment reads as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall

issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Const. art. 1, § 7 states:

No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

■ The above provisions in the United States and State Constitutions, although they vary slightly in language, are identical in purpose and substance. *State v. Miles,* 29 Wn. 2d 921, 190 P.2d 740 (1948). It is only unreasonable searches and seizures, made without probable cause, that are forbidden. *State v. Thomas,* 183 Wash. 643, 49 P.2d 28 (1935).

In deciding the precise question, we recognize that the numerous federal and state cases including our own that were cited are not apposite. The cases usually involve the authority to inspect which attaches when some type of regulated activity is undertaken, *e.g.,* engaging in certain types of business affected with a public interest and, hence, subject to the police power of the state. See Davis, Federal Searches and Seizures § 9.2; and 4 Wharton's Criminal Law and Procedure § 1532 (Anderson ed. 1957); *State v. McFarland,* 60 Wash 98, 110 Pac. 792 (1910), relating to the licensing and inspection of hotels; *Gange Lumber Co. v. Henneford,* 185 Wash. 180, 53 P.2d 743 (1936), requiring taxpayers to furnish information as to their capital, debts, earnings, etc.; *Kelleher v. Minshull,* 11 Wn.2d 380, 119 P.2d 302 (1941), authorizing access to the office and place of business of the individual and permitting an examination of the books, pertaining to the small loan business. These cases typify the sustained constitutionality of ordinances and statutes regarding inspection with which we have been concerned.

We are not here involved with a regulated activity giving rise to routine inspections. The question is whether a search without warrant, unjustified by suspicion of reasonable cause, is permitted.

Two cases recently decided by the Supreme Court of the United States are in point.

The first case is *Frank v. Maryland,* 359 U.S. 360, 3 L. Ed. 2d 877, 79 Sup. Ct. 804, argued March 5, 1959, and decided May 4, 1959. Therein it was held that the power to inspect dwelling places *either as a matter of systematic area-by-area search* or to treat a specific problem of rat infestation is of indispensible importance to the maintenance of community health. The court stated that this power would be greatly hobbled by blanket requirement of safeguards necessary for a search of evidence of criminal acts. It was held that the Baltimore ordinance providing that whenever the commissioner of health *shall have cause* to suspect that a nuisance exists in any house, cellar, or inclosure, he may demand entry therein in the daytime and if the owner or occupant shall refuse or delay to open the same and admit a free examination he shall forfeit and pay for every such refusal the sum of $20. Mr. Justice Frankfurter, speaking for the court, said, p. 366:

> The power of inspection granted by the Baltimore City Code is strictly limited, *more exacting than the analogous provisions of many other municipal codes.* Valid grounds for suspicion of the existence of a nuisance must exist. Certainly the presence of a pile of filth in the back yard combined with the run-down condition of the house gave adequate grounds for such suspicion. The inspection must be made in the day time. Here was no midnight knock on the door, but an orderly visit in the middle of the afternoon with no suggestion that the hour was inconvenient. Moreover, the inspector has no power to force entry and did not attempt it. A fine is imposed for resistance, but officials are not authorized to break past the unwilling occupant.
>
> . . . .
>
> The need to maintain basic, minimal standards of housing, to prevent the spread of disease and of that pervasive breakdown in the fiber of a people which is produced by slums and the absence of the barest essentials of civilized living, has mounted to a major concern of American government. The growth of cities, the crowding of populations, the increased awareness of the responsibility of the state for the living conditions of its citizens, all have combined to create problems of the enforcement of minimum standards of far greater magnitude than the

writers of these ancient inspection laws ever dreamed. Time and experience have forcefully taught that the power to inspect dwelling places, *either as a matter of systematic area-by-area search* or, as here, to treat a specific problem, is of indispensable importance to the maintenance of community health; a power that would be greatly hobbled by the blanket requirement of the safeguards *necessary for a search of evidence of criminal acts.* The need for preventive action is great, and city after city has seen this need and granted the power of inspection to its health officials; and these inspections are apparently welcomed by all but an insignificant few. Certainly, the nature of our society has not vitiated the need for inspections first thought necessary 158 years ago, nor has experience revealed any abuse or inroad on freedom in meeting this need by means that history and dominant public opinion have sanctioned.

That there is "a total unlikeness" between "official acts and proceedings," *Boyd v. United States,* 116 U. S. 616, 624, for which the legal protection of privacy requires a search warrant under the Fourteenth Amendment, and the situation now under consideration is laid bare by the suggestion that the kind of an inspection by a health official with which we are concerned may be satisfied by what is, in effect, a synthetic search warrant, an authorization "for periodic inspections." If a search warrant be constitutionally required, the requirement cannot be flexibly interpreted to dispense with the rigorous constitutional restrictions for its issue. A loose basis for granting a search warrant for the situation before us is to enter by way of the back door to a recognition of the fact that by reason of their intrinsic elements, their historic sanctions, and their safeguards, the Maryland proceedings requesting permission to make a search without intruding when permission is denied, do not offend the protection of the Fourteenth Amendment. (Italics ours.)

*Frank* establishes the proposition that reasonable administrative searches may be conducted without search warrants.

The other case is *Ohio ex rel. Eaton v. Price,* 360 U.S. 246, 3 L. Ed. 2d 1200, 79 Sup. Ct. 978. That decision was appealed from the Ohio Supreme Court and decided June 8, 1959. The defendant owned and resided in a private residence in

Dayton, Ohio. Three housing inspectors sought admittance to his home pursuant to a city ordinance which authorized them to enter any dwelling at a reasonable hour and upon showing proper identification for the purpose of inspecting the dwelling to determine if it conformed to the minimum standards of health and safety. The inspectors gave no reason or cause for the particular inspection, but merely told the defendant that they had a right to inspect any home.

Defendant was subsequently served with a warrant to appear in court for violation of the ordinance, which violation could result in a fine or imprisonment or both. As he was unable to provide bail, he was jailed. Eaton, an attorney, filed a petition for a writ of habeas corpus in the state court of common pleas against the chief of police. That court found the ordinance unconstitutional. It was reversed by the Ohio Court of Appeals.

The Ohio Court of Appeals (Montgomery County) in November, 1957, in *State ex rel. Eaton v. Price*, 105 Ohio App. 376, 152 N.E.2d 776, affirmed 168 Ohio St. 123, 151 N.E.2d 523 (1958), held that an ordinance which establishes minimum standards for dwellings, authorizes a housing inspector "to enter, examine and survey at any reasonable hour" same, and which provides penalties for violation thereof, was not arbitrary, discriminatory, or unreasonable. The Ohio court said that it is a valid exercise of the police power and that the inspection contemplated by such ordinance is not violative of the Ohio Constitution prohibiting "unreasonable searches." The court said, p. 391:

> After giving due consideration to the rulings in the cited cases and the applicable principles of law, we are of the opinion that in the instant case the inspection is a routine matter; it is to be made during reasonable hours and is primarily for protective and not punitive purposes, and is in the interest of the general welfare. The inspection contemplated by the ordinance is not an "unreasonable search" within the meaning of the provision prohibiting "unreasonable searches and seizures" . . . .

On appeal to the United States Supreme Court, the decision of the Ohio court was affirmed by an equally divided

court. The court stated that the facts in *Eaton* were similar to those in *Frank* and that it would be a manifestation of disrespect to allow the *Frank* case to be overruled so shortly after it was decided.[1]

Although, in affirming *Eaton*, the first group of justices stated that the facts in *Eaton* are similar to those in *Frank*, it should be noted that *Frank* held valid an ordinance authorizing a search by a health inspector without a warrant, if there were reasonable grounds for believing the house was below the minimum standards of health and safety. The ordinance in *Eaton* did not provide for any grounds or reasons for a search and, thus, would permit systematic area-by-area inspection, whereas, in *Frank*, it permitted inspection to treat a specific problem. We are reminded that Mr. Justice Frankfurter stated in *Frank* that area-by-area inspections are indispensible.

The above cases deal with a man's castle—his home. In the instant case, we are concerned with a warehouse and business property. The ordinance in question excepts the "interior of dwellings."

■ This case does not involve the search of evidence for criminal acts, but even the safeguards necessary for *such* evidence are not so stringent with reference to premises other than a man's home or dwelling.

In Davis, Federal Searches and Seizures § 1.31, p. 8, it was observed:

> The requirements of the Fourth Amendment receive their strictest application when a dwelling house is involved in a search. This fact is based on the traditional concept of the sanctity of the home and the peaceful enjoyment of its privacy.

The United States Supreme Court has applied different standards of reasonableness to searches of dwellings than to places of business. *Davis v. United States*, 328 U.S. 582, 90 L. Ed. 1453, 66 Sup. Ct. 1256 (1946). The lower federal

---

[1]Mr. Justice Stewart declined to sit on the case because his father was serving on the Supreme Court of Ohio when the case came before the court.

courts also reflect this attitude: "We realize, of course, that the fact that the premises are a residence requires stricter requirements of reasonableness." *Smith v. United States,* 254 F.2d 751 (1958), *cert. denied* 357 U.S. 937, 2 L. Ed. 2d 1552, 78 Sup. Ct. 1388. "It seems to be generally agreed that the Amendment applies most importantly to searches of dwelling houses . . . ." *United States v. Turner,* 126 F. Supp. 349 (1954). "What may be unreasonable in a search of a man's house, may be entirely reasonable in a search of his place of business." *Giacona v. United States,* 257 F.2d 450 (1958), *cert. denied* 358 U.S. 873, 3 L. Ed. 2d 104, 79 Sup. Ct. 113.

The dissenting opinion in *Frank, supra,* deals primarily with the homeowner. It is there stated, p. 374:

The decision today greatly dilutes the right of privacy which every homeowner had the right to believe was part of our American heritage.

The question in this case is whether a search warrant is needed to enter a citizen's home to investigate sanitary conditions. The Court holds that no search warrant is needed, that a knock on the door is all that is required, that for failure of the citizen to open the door he can be punished.

█ It is reasonable to believe that even the minority in *Frank* and *Eaton* would reach a different conclusion and apply different standards of reasonableness to a fact pattern such as that in the case at bar. A home is not involved in the instant case. A related issue is the knowledge gained by the inspection for possible use in any subsequent criminal cases. That is a question we do not pass upon at this time, since it is not before us. The ordinances in question authorize the fire chief to "enter all buildings and premises except the interior of dwellings as often as may be necessary" for finding and correcting any conditions liable to cause fires. No criminal charge is to be made upon discovery of a fire hazard. The code provides instead that whenever the fire chief finds in any building or upon any premises dangerous or hazardous conditions he "shall order such dangerous conditions or material to be removed or

remedied in such manner as may be specified." An "order for correction" is then served upon the owner or occupant of the premises. But it should be noted that an inspection in the present case was only for discovery of fire hazards. No evidence would be seized for use in court and there was no threat of criminal penalty even if fire hazards were detected.

Section 8.01.010 of the fire code, *supra,* prescribes minimum standards for the safeguarding of life and property in the use and occupancy of buildings other than dwellings. The purpose of the fire code inspections is to correct conditions hazardous to life and property. The problem of keeping cities and their inhabitants free from explosions and fires is a serious task facing all fire departments. It is obvious that routine inspections are necessary to insure the safeguarding of life and property. The need to conduct routine inspections of commercial premises, in regard to which probable cause for the issuance of a warrant could not ordinarily be established, outweighs the interest in privacy with respect to such premises. The purpose of the inspection contemplated by the code is not unreasonable.

There is no accepted yardstick for measuring the reasonableness of a search. What is reasonable is not determined by any fixed formula. The recurring questions of reasonableness of searches must find solution in the facts and circumstances of each case. This means the decided cases provide the only guidelines for determining the reasonableness of a search. See Davis, Federal Searches and Seizures; *United States v. Rabinowitz,* 339 U.S. 56, 94 L. Ed. 653, 70 Sup. Ct. 430 (1950).

In the light of *Frank* and *Eaton, supra,* we hold that the sanctions of U. S. Const. amend. 4 and Const. art. 1, § 7, have not been violated by the provisions of the Seattle Fire Code as herein set out.

Finally, it is urged by appellant that the ordinance is unconstitutional because it violates the equal protection clause of the U. S. Const. amend. 14, and the privileges and immunities clause, Const. art. 1, § 12, as well. These violations, it is contended, are the result of the "arbitrary and

unreasonable" classification of all buildings into those having not more than two dwelling units and serving not more than 15 persons and that of every other type of building.

The guarantee of equal protection of the laws and the prohibition of special privileges and immunities require that class legislation apply alike to all persons within a class, and reasonable ground must exist for making a distinction between those within and those without a specified class. *Clark v. Dwyer*, 56 Wn.2d 425, 353 P.2d 941 (1960). "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 99 L. Ed. 563, 75 Sup. Ct. 461 (1955). Appellant does not suggest that that point has been reached in this case. The United States Supreme Court has, on another occasion, stated, "Equal protection does not require identity of treatment." *Walters v. St. Louis*, 347 U.S. 231, 237, 98, L. Ed. 660, 74 Sup. Ct. 505 (1954). The very act of classification involves some degree of discrimination. Equal protection "only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." *Walters, supra.* There is remaining a wide area of legislative discretion.

We held in *State v. McFarland*, 60 Wash. 98, 110 Pac. 792 (1910), that a statute providing for the inspection of inns and hotels having 10 or more rooms was not an unreasonable classification and did not violate either state or federal constitution. There is not a great deal of distinction between *McFarland* and the case at bar.

"A statutory enactment cannot be successfully attacked unless the discrimination or inequality produced by the particular classification is manifestly arbitrary, unreasonable, inequitable and unjust. . . ." *State v. Persinger*, 62 Wn.2d 362, 368, 382 P.2d 497 (1963). Such has not been shown to be the circumstances in the instant case.

Judgment affirmed.

FINLEY, WEAVER, and HAMILTON, JJ., concur.

ROSELLINI, C. J., concurs in the result.

---

January 19, 1966. Petition for rehearing denied.

*Reported in 408 P.2d 269.